## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT B. MULCAHY, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-07-1913 |
| | § | |
| HOUSTON COMMUNITY COLLEGE SYSTEM, | § | |
| MARGARET F. FORD, And GLORIA J. WALKER, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendants' Houston Community College System ("HCCS"), Margaret F. Ford ("Ford"), and Gloria J. Walker's ("Walker") (collectively "Defendants") motion for summary judgment.  Dkt. 32.  Upon consideration of the motion, the response, the reply, the summary judgment record, and the applicable law, the defendants' motion for summary judgment is GRANTED.

## I. BACKGROUND

Plaintiff Robert B. Mulcahy ("Mulcahy") asserts claims against the defendants for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA") and the Texas Commission on Human Rights Act, TEX. LABOR CODE § 21.001 ("TCHRA"), and a deprivation of liberty interest claim under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  Dkt. 28, ¶¶ 13-22.  Mulcahy also alleges that defendant HCCS aided, abetted, incited, or coerced a person to engage in a discriminatory practice in violation of the TCHRA, TEX. LABOR CODE § 21.056.  *Id.* at ¶¶ 23-25.

Before his termination on July 15, 2005, Mulcahy was an at-will employee of HCCS.  Dkt. 32, Ex. 1, ¶ 10; Ex. 2 at 11:5.  Mulcahy had worked for HCCS since its founding in 1971, and was its longest serving employee.  Dkt. 33, Ex. 1 at 5 & 56:6-13.  In 2005, Mulcahy was sixty-nine years old, and was one of the highest paid non-contract employees.  *Id.* at 56:6-13.

HCCS uses a hierarchical structure, where the main administrative office controls the six main colleges (the "System") below.  *Id.* at 16.  This structure creates essentially a two-tier system: a System level at the administrative level, which oversees the entire System; and a College level, which governs a specific college within the System.  Dkt. 32, Ex. 1, ¶ 4.  However, HCCS and the colleges operate on a matrix system of management, in which personnel with similar skills and responsibilities work together to achieve the goals of HCCS regardless of formal reporting structures.  Dkt. 32, Ex. 3 , ¶ 4.

During the 2004–05 school year, Mulcahy served as the college operations officer ("COO") of HCCS's Northeast College.  Dkt. 32, Ex. 3, ¶ 5; Ex. 2 at 11, 21.  The COO position is a senior position at the College level, and Mulcahy reported directly to defendant Ford, the president of Northeast College.  Dkt. 32, Ex. 3, ¶¶ 5-6.  As the COO, Mulcahy was responsible for assisting "the President in the supervision and monitoring of expenditures of all College funds."  Dkt. 32, Ex. 1, ex. D.  Mulcahy also assisted the President in determining "the most efficient and effective use of allocated funds and facilities."  *Id.*  Aside from the allocation of funds, Mulachy was responsible for initiating, preparing, and maintaining "all correspondence, reports, and studies related to college operations."  *Id.*  More importantly, Mulcahy acted "as a liaison with the System to oversee and coordinate actual construction/renovation activities and report."  *Id.*  He carried out his liaison duties by attending weekly meetings at the System during construction.  Dkt. 32, Ex. 2 at 65.  Mulcahy also "submit[ted] proposals for system review for building leases and contracts."  *Id.*  When a lease was

2

to be amended, the COO or President negotiated the business terms of the amendment and submitted the amendment through the Vice Chancellor for Finance and Administration to the Board of Trustees for approval.  Dkt. 32, Ex. 4, ¶¶ 10, 16–17.

Until the incident that forms the basis of this case, Mulcahy's direct supervisor, Ford, indicated satisfaction with his job performance.  In August 2004, Ford conducted an evaluation and recommended Mulcahy's continued employment. Dkt. 32, Ex. 1, ex. F.  Ford's responsibilities were broad-based because she was the administrative head of Northeast College.  Dkt. 32, Ex. 1, ¶ 4. When there was construction on any of the Northeast College facilities, Ford relied on Mulcahy to ensure that the facilities were maintained and in good condition.  Dkt. 32, Ex. 3, ¶ 6.

Defendant Walker was the Vice Chancellor of Finance and Administration at the time of the events at issue.  Dkt. 32, Ex. 4, ¶ 2.  As the Vice Chancellor, Walker was responsible for the System's offices for business affairs, finance and budget, procurement and purchasing, risk management, and facilities.  *Id.* at ¶ 3.  Walker monitored expenditures, and possessed a certain amount of signatory authority over the release of public funds.  *Id.*

The dispute revolves around roof repairs done to a building leased for the Northeast College of HCCS at the Northline Mall.  Dkt. 28, Ex. 2 at 5-6.  In 2003 and 2004, Kenny Gates, a building maintenance supervisor for the System, received complaints that the roof at the Northline Mall was in disrepair.  Dkt. 32, Ex. 7, ¶ 7.  Gates notified his boss Timothy Rychlec about the roof and they submitted a repair proposal to Walker.  Dkt. 32, Ex. 6, ¶¶ 6, 9.  Walker told Gates and Rychlec to talk to Mulcahy to confirm that HCCS was responsible for the repairs to the Northline facility.  *Id.* When asked, Mulcahy confirmed that the roof repairs were HCCS's responsibility.  Dkt. 32, Ex. 6, ¶ 10.  Based on Mulcahy's confirmation, Walker approved the repair proposal.  Dkt. 32, Ex. 6, ¶ 11. The roof repairs were scheduled to begin in October 2004.  Dkt. 32, Ex. 6, ¶ 7.

3

After the roof repairs were underway, Mulcahy, Ford, Walker, and Chancellor Bruce Leslie learned that the owners were planning to tear down the Northline Mall.  Dkt. 32, Ex. 3, ¶ 9.  On February 9, 2005, Ford, Walker, Mulcahy, and a real estate agent met with the Northline Mall owners.  *Id.*  After obtaining a copy of the Northline lease, Mulcahy, Ford, Walker and Leslie found that HCCS was not responsible for the roof repairs.  Dkt. 32, Ex. 4, ¶ 13.  HCCS then modified the roof repairs, still spending $691,000.00 in total.  Dkt. 32, Ex. 6, ¶ 15.

In response to this erroneous expenditure, the Chancellor initiated an investigation into the handling of the roof repair.  Dkt. 32, Ex. 8, ¶ 7.  Chancellor Leslie spoke with HCCS's General Counsel, and HCCS hired Nicole DeBorde, a former prosecutor with experience in the public integrity unit of the Harris County District Attorney's office, to investigate why HCCS paid for the roof repairs.  *Id.* at ¶¶ 7-8.  On April 27, 2005, DeBorde submitted her written report, concluding that Mulcahy was the primary employee at fault given his job description.  Dkt. 32, Ex. 5; Dkt. 32, Ex. 14.  Based on DeBorde's report, Ford recommended termination of Mulcahy's employment as COO. Dkt. 32, Ex. 3, ¶ 17.  Chancellor Leslie reviewed Ford's recommendation and approved the termination.  Dkt. 32, Ex. 8, ¶ 10.  Ford, along with a human resources representative, met with Mulcahy on June 28, 2005 to notify Mulcahy that his employment would be terminated effective on July 15, 2005.  Dkt. 32, Ex. 3, ¶ 19.

Immediately following the termination, Mulcahy filed a charge against the HCCS with the Equal Employment Opportunity Commission ("EEOC").  On December 13, 2006, the EEOC made a preliminary determination that there was reasonable cause to believe that the defendants discriminated against Mulcahy based on age and invited the parties to settle. Dkt. 33, Ex. 8.  When no settlement was reached, the EEOC issued a right to sue letter, and Mulcahy commenced this action.

## II. STANDARD OF REVIEW

**A.      Summary Judgment Standard**

A timely motion for summary judgment shall be granted "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345

(5th Cir. 2008).  Upon a defendant's motion for summary judgment, the plaintiff "must set forth

specific facts showing that there is a genuine issue for trial.  If he does not so respond, summary

judgment, if appropriate, shall be entered against him." FED. R. CIV. P. 56(e).  Ultimately, "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 106 S. Ct. 1348 (1986).  An issue is "material" if its resolution could affect the outcome

of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir.

2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the

non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence

demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden

does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material

fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary

judgment, and no defense to the motion is required.  *Id.*  "For any matter on which the non-movant

would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence

and thereby shift to the non-movant the burden of demonstrating by competent summary judgment

5

proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the nonmovant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); see also *Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## B.    Age Discrimination Standard

As a threshold matter, both Texas and Federal District Courts consistently construe age discrimination claims under the TCHRA and under the ADEA in tandem. *See McLaren v. Morrison Mgmt. Specialists, Inc.*, 316 F. Supp. 2d 489, 498 (W.D. Tex. 2004), *aff'd*, 420 F.3d 457 (5th Cir.

6

2005).  "In fact, courts are entitled to examine federal case law for guidance and it may be cited as

authority."  *Id.*; *see also Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996)

("Because one purpose of the Commission on Human Rights Act is to bring Texas law in line with

federal laws addressing discrimination, federal case law may be cited as authority.").  Therefore, the

court addresses both claims under the rubric of the ADEA inquiry.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any

individual or otherwise discriminate against any individual with respect to compensation, terms,

conditions, or privileges of employment, because of an individual's age."  29 U.S.C. § 623(a)(1).

"In employment discrimination cases, a plaintiff may present his case by direct or circumstantial

evidence, or both."  *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002); *see also*

*Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001).  If the plaintiff presents his

case using only circumstantial evidence, then the court analyzes the discrimination claim with the

*McDonnell Douglas* burden-shifting framework.  *Sandstad*, 309 F.3d at 896 (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973)); *see also Quantum*, 47 S.W.3d

at 477.  Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie*

case.  *Sandstad*, 309 F.3d at 897.  More specifically, a "plaintiff must show that '(1) he was

discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of

discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by

someone younger, or iii) otherwise discharged because of his age.'"  *Palasota v. Haggar Clothing*

*Co.*, 342 F.3d 569, 576 (5th Cir. 2003) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957

(5th Cir. 1993)) (emphasis omitted).  An ADEA plaintiff can show he was "otherwise discharged

because of his age" by showing that he was treated less favorably than younger, similarly situated

coworkers.  *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512–13 (5th Cir.

2001).  If the plaintiff can establish a *prima facie* case under this standard, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the employment action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S. Ct. 2742 (1993); *Bauer v. Abermarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999); *see also Quantum*, 47 S.W.3d at 477.  The defendant's burden to show a legitimate, nondiscriminatory reason is "only one of production, not persuasion, involving no credibility assessments." *West v. Nabors Drilling USA, Inc.*, 330 F3d 379, 385 (5th Cir. 2003) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)).  If the defendant meets this burden, the burden shifts back to the plaintiff to show the defendant's proffered nondiscriminatory reason is a pretext for age discrimination.  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 351 (5th Cir. 2005) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).  "The plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Sandstad*, 309 F.3d at 897.

### III. ANALYSIS

Defendants HCCS, Ford, and Walker move the court for summary judgment in this matter, asserting that Mulcahy cannot prove that the reasons for terminating his employment are actually a pretext for age discrimination.  Defendants also assert that summary judgment is proper regarding the due process/liberty claim because Mulcahy failed to respond to the defendants' motion for summary judgment on this issue.  In the alternative, the defendants argue summary judgment is proper on Mulcahy's § 1983 due process claim because defendants Ford and Walker are entitled to qualified immunity.

**A.     Age Discrimination Claims under the ADEA and TCHRA**

Defendants concede that Mulcahy has made the necessary *prima facie* case.  However, they argue that they terminated Mulcahy's employment because of his mishandling of the Northline roof repairs—a legitimate, nondiscriminatory reason.  Additionally, they argue that Mulcahy cannot put forth sufficient evidence to meet his burden to prove that their legitimate, nondiscriminatory purpose was merely a pretext for age discrimination.

   *i.     Mulcahy's* Prima Facie *Case*

Defendants concede that Mulcahy has made the requisite showing for a *prima facie* case. Dkt. 32.  Mulcahy was within the protected class at the time of discharge, and was qualified for the position.  *Id.*  All other employees who filled the COO position on an interim basis were younger than Mulcahy.  Dkt. 32.  Mulcahy was immediately succeeded by interim COO David Joost, age forty-seven, and later Abe Bryant, age sixty-four.  *Id.*  Furthermore, a younger employee replaced Mulcahy.  *Id.*  Defendants hired Kathi Redricks, age forty-nine, to fill Mulcahy's vacated position of COO.  *Id.*, Ex. 1, ¶ 15.  Therefore, Mulcahy has established a *prima facie* case under the ADEA and TCHRA.  *See Palasota*, 342 F.3d at 576.

   *ii.     Defendants' Legitimate, Nondiscriminatory Reason for Firing Mulcahy*

The burden therefore shifts to defendants to produce a legitimate, nondiscriminatory reason for terminating Mulcahy's employment.  They argue that Mulcahy was fired solely on the basis of his mishandling of the Northline roof repair.  Dkt. 32.  They claim that the termination of Mulcahy's employment stems from DeBorde's third-party investigative report regarding the erroneous expenditure for the roof repairs.  Dkt. 32, Ex. 14.  DeBorde concluded that Mulcahy, as COO, was responsible for the information contained within the Northline Mall lease.  *Id.*  The report's conclusions were based heavily on an examination of the COO's official job description and

interviews with the people involved. *Id.* DeBorde interpreted Mulcahy's job description as a whole to include a working knowledge of the Northline lease. Dkt. 32, Ex. 5 at 47–50. She concluded that Mulcahy was the person responsible for the erroneous roof expenditure. Dkt. 32. Defendants contend that they relied on her conclusions when they fired Mulcahy.

Mulcahy's direct supervisor, Ford, relied on him to protect the rights of the College by keeping her informed of any issues regarding and by maintaining all Northeast College facilities and buildings. Dkt. 32, Ex. 3, ¶ 6. In August 2004, Ford gave Mulcahy a favorable employee review, recommending Mulcahy's continued employment. Dkt. 32, Ex. 1, ex. F. However, once the roof repair incident occurred, Ford states that she lost faith in Mulcahy's ability to represent the College in business matters. Dkt. 32, Ex. 3, ¶ 15. Based on DeBorde's report and her lack of faith in Mulcahy's abilities, Ford recommended to Chancellor Leslie that Mulcahy be fired. *Id.* at ¶ 17. After reviewing Ford's recommendation, Chancellor Leslie made the decision to terminate Mulcahy's employment. Dkt. 32, Ex. 8, ¶¶ 7–8.

Defendants therefore contend that Mulcahy was fired over his mishandling of the Northline roof repairs, costing defendants a substantial amount of money on repairs for which they were not responsible. The court finds that defendants have carried their burden to produce evidence of a legitimate, nondiscriminatory reason for terminating Mulcahy's employment. Accordingly, the burden shifts back to Mulcahy to prove that defendants' reason is merely pretext or not credible. *Machinchick*, 398 F.3d at 351.

 *iii.* *Pretext*

Mulcahy attacks defendants' reason for terminating his employment as pretext on several grounds. First, Mulcahy argues that DeBorde's investigation was biased from the beginning, and was directed at Mulcahy. Dkt. 33 at ¶ 18. Mulcahy contends that the investigation was framed and

presented in such a way as to implicate him before the investigation was underway.  *Id.*  According

to the record,  DeBorde was instructed to investigate Mulcahy's involvement in the Northline roof

repair incident.  Dkt. 33, Ex. 17 at 54–55.  The investigation, prompted by Ford's loss of confidence

in Mulcahy, was indeed centered on Mulcahy.   However, DeBorde was never instructed to find

Mulcahy responsible, only to find who was responsible for HCCS's erroneous payment.  Dkt. 32,

Ex. 5 at 15.  There is no evidence in the record to suggest that the investigation was  initiated as a

"witch hunt."  Mulcahy argues that DeBorde intended to interview him late in the investigation so

she could gather information about him first.  However, the order of interviews, with Mulcahy as the

final interviewee, was reasonable given the direction of the investigation.  DeBorde interviewed

Mulcahy last "in order to better compare information received from other potential witnesses."  Dkt.

32, Ex. 14.  The record simply does not support Mulcahy's assertion that the interview order was

based on an improper motive—discrimination based on age.

Mulcahy also alleges the report was biased because it overlooked the large number of HCCS

employees who believed—as Mulcahy claims he did—that HCCS was responsible for the Northline

roof repairs.  Dkt. 33 at 10.  Even if that were the case, what everyone else thought about the

obligations under the contract is irrelevant to whether Mulcahy, in his capacity as COO, should have

fulfilled his job description and looked at the lease.  DeBorde's conclusions were based on who

should have looked at the Northline Mall lease rather than popular opinion regarding the lease's

requirements.  Therefore, Mulcahy has failed to show a genuine issue of material fact regarding

whether the report was biased.

Second, Mulcahy argues that individuals at the System level were responsible for the content

of the Northline lease, because they negotiated the original lease, and he did not.  Dkt. 33 at 12.

Mulcahy points to the fact that the System has the ultimate say in approving all leases, and that his

job was simply to submit proposals to the System for review. *Id.* at 13.  Therefore, Mulcahy argues that there is a genuine issue of material fact regarding the defendants' proffered legitimate, nondiscriminatory reason for terminating Mulcahy's employment. *Id.*  The court disagrees.

As a threshold matter, whether Mulcahy participated in the negotiations of the original lease has no bearing on his responsibility to familiarize himself with its contents.  His argument that he did not have a copy of the lease fails for the same reason.  The defendants' reasonable interpretation of Mulcahy's job description includes taking the initiative to learn the basic contents of the legal documents regarding the buildings over which he had authority.  Certainly when projects as major as the Northline roof project are proposed, it is reasonable for the defendants to have expected that someone in the COO position, with its job description, would have gotten a copy of the lease to review prior to commencement of construction.

And, the court notes that this expectation is not inconsistent with Mulcahy's own actions in other similar matters.  When the facilities assessment that indicated the need for a new roof for Northline was completed, other projects were on the list.  One of them—the Pinemont facility—also required a roof repair.  Mulcahy informed the director of maintenance for the System that the Pinemont facility was rented and therefore the landlord was responsible for the repairs.  Dkt. 32, Ex. 6, ¶ 4.  His working knowledge of the Pinemont lease and intervention to assure that HCCS did not pay for the Pinemont roof repair falls squarely within DeBorde's and the defendants' interpretation of his job description.  Therefore, a similar expectation with regard to the Northline facility is not unreasonable.  Mulcahy has not proffered any evidence to show that HCCS did not rely on its own interpretation of the COO's job description to evaluate Mulcahy's mishandling of the Northline roof repair.  And, even if the defendants' interpretation was incorrect, Mulchay would not have met his burden to prove pretext, because "even an incorrect belief that an employee's performance is

inadequate constitutes a legitimate, nondiscriminatory reason." *Mayberry v. Voight Aircraft*, 55 F.3d 1086, 1091 (5th Cir. 1995).

Third, Mulcahy seeks to prove that HCCS's reason for termination was false by producing evidence showing that Mulcahy did not have the final authorization of the funds.  Dkt. 33 at 13. Although it is true Mulcahy did not have final authorization of the funds, Ford and Walker depended on Mulcahy for information regarding the Northeast College facilities, including the Northline Mall. Dkt. 32, Ex. 3, ¶ 6; Ex. 4, ¶ 6.  And, for the reasons stated above, it was not unreasonable for them to expect the COO to advise them on the buildings he supervised, up to and including the contents of the Northline lease.

Last, Mulcahy argues that the EEOC's determination that there was reasonable cause to believe that the defendants discriminated against him based on age creates a fact question.  However, the EEOC determination issued in this case does not suffice.  Dkt. 32, Ex. 8.  The EEOC investigation found that Mulcahy had not told anyone that HCCS was responsible for the roof repairs and that he was not custodian responsible for administering the lease.  However, the letter is an unsworn document containing only broad factual and legal findings unsupported by any evidence. *See Wright v. Columbia Women & Children's Hosp.*, 2002 WL 495325 at *4 (5th Cir. 2007).  And, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."  *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997).  Therefore, in this case, the EEOC determination letter does not create an issue of material fact precluding summary judgment.

In sum, Mulcahy offers only unsupported allegations and conclusions to support his argument that defendants' reason was pretextual or not credible.  Mulcahy's burden is to adduce evidence "so persuasive as to support an inference that the real reason was discrimination."  *Rubenstein v.*

*Administrators of the Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000).  At best Mulcahy has adduced evidence suggesting that HCCS had a different interpretation of his job description than Mulcahy did.   Accordingly, Mulcahy fails to meet his burden under the *McDonnell Douglas* framework and defendants' motion for summary judgment is GRANTED as to Mulcahy's claims for age discrimination under the ADEA and TCHRA.

**B.      Section 1983 Claim**

In his complaint Mulcahy also brings a claim for deprivation of a liberty interest protected by the Fourteenth Amendment to the United States Constitution.   In their motion for summary judgment, defendants argue that Mulcahy cannot identify the liberty interest at issue and point to an absence of evidence to support the claim.   Because Mulcahy would bear the burden of proof on his § 1983 claim at trial, the defendants' motion shifted the burden to Mulcahy to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (1986) (quoting FED. R. CIV. P. 56(e)).   However, in his response Mulcahy does not address the § 1983 claim at all.   Therefore, he has failed to meet his burden to demonstrate "by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica*, 66 F.3d at 718–19.   Accordingly, the defendants' motion for summary judgment on Mulcahy's § 1983 claim is GRANTED.

**C.      TCHRA Aiding, Abetting, Inciting or Coercing Discrimination**

Finally, Mulcahy brings a claim under § 21.056 of the TCHRA.   That section makes it a violation if "[a]n employer . . . aids, abets, incites, or coerces a person to engage in a discriminatory practice."  TEX. LABOR CODE § 21.056.   Because Mulcahy has failed to meet his burden to show that defendants engaged in a discriminatory practice, his claim for aiding and abetting in a discriminatory

practice fails at the outset.  Therefore, the defendants' motion for summary judgment on Mulcahy's § 21.056 claim is GRANTED.

## IV. Conclusion

Pending before the court is defendants' motion for summary judgment.   For the foregoing reasons, the motion is GRANTED.

It is so ORDERED.

Signed at Houston, Texas on May 7, 2009.

Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY

15